ADDIE L. PERKINS

*v.*

LUTHER W. PERKINS.

[Filed April 14th, 1900.]

1. A wife's confession of adultery cannot be established by the unsupported testimony of the husband.

2. Where such a confession is first obtained by a husband, and by him procured to be copied by a scrivener, and he brings his wife to the signing of the paper thus prepared by threats of violence, and waits in the next room while she signs it, and immediately that she does so possesses himself of the paper, the confession will not be received as the voluntary statement of the wife.

On bill for alimony, answer and proofs.

The complainant, under section 20 of the Divorce act (*Gen. Stat. p. 1270*), alleges that her husband has abandoned and does not support her, and seeks a decree for alimony.

The answer originally filed by the defendant admits the marriage, denies the specific acts of cruelty and ill treatment alleged in the bill, and comes very near to an admission of abandonment in these words, " that the complainant, at the various times stated in the bill of complaint, returned to the house of this defendant, and was ejected by him," &c. As to non-support, the answer says, " that for the foregoing causes in this answer set forth, he has refused to maintain and provide for the said complainant." The cause referred to was the alleged adultery of the wife, which was intimated, but not substantially charged, in the defendant's answer.

The vice-chancellor, in this condition of the pleadings, declined to hear proof of the marriage, or of non-support, which were fully admitted in the answer, and called on the complainant to prove abandonment by the husband, and his ability to support his wife, &c. The subsequent evidence taken did, how-

ever, fully prove the marriage, and also abandonment and non-support by the husband of the wife.

On the opening of the cross-examination of the wife, the defendant's counsel put questions which he admitted were intended to set up the defence of the wife's adultery. On objection made, the vice-chancellor held the original answer to be insufficient to support that defence, but that, in view of the fact that the complainant was fully notified that such a defence might be made, an amendment definitely charging her with adultery was allowable.

An amendment to the answer was then made, which charges that the complainant committed adultery on four different occasions, all with the same man, named in the amendment. These allegations are themselves based upon the details contained in a paper which the husband contends is the wife's confession of her fault.

The wife denies her guilt, and insists that the alleged confession was obtained from her by her husband under circumstances which overcame her free will; that the incidents narrated in the supposed confession are all false, and never happened.

Incidental to and in explanation of the abandonment by the husband of his wife, the relations of these parties are further exhibited by the proof, without dispute, that the husband has, for several years prior to September, 1898, lived in a state of adultery with a paramour.

The whole defence is based upon the assertion by the husband that the wife had also committed adultery, and that she, for this reason alone, was not entitled to support from him.

*Mr. Charles E. Hendrickson*, for the complainant.

*Messrs. Gilbert & Atkinson*, for the defendants.

GREY, V. C.

This matter was previously before the court upon affidavits seeking alimony *pendente lite*, and on that application alimony was allowed. It has now come to final hearing, and testimony

has been submitted in open court at great length. The whole case presented turns upon the defence which charges adultery against the wife and her denial of it.

The only proof of the fact of adultery is the alleged confession of the wife in writing, which she signed, and the statements which she is alleged to have made to the husband. If the wife's alleged confession and the statements ascribed to her by her husband's testimony should be eliminated, there would be nothing in the case to support the charge against her.

The question of the effect of a confession by a wife of her adultery has been fully considered in *Summerbell* v. *Summerbell, 10 Stew. Eq. 603.* In that case the opinion of Barker Gummere, Esq., as master, collates and comments upon the cases in a manner so thorough and discriminating as to be of the utmost value. The opinion of the court of appeals, affirming the decree advised by him, discusses the special facts shown. The syllabus of the case states the principle which governed the decree advised by the master and affirmed on appeal. The whole dispute turned upon the weight to be given to a confession of adultery by the wife, and the court of appeals declared that such a confession, written by the wife in the presence of the husband, is presumed to be procured by coercion and is not a safe basis upon which to build up a charge of adultery against her.

The case now under consideration is for alimony and not for divorce, but the defence set up is the adultery of the wife, and the same considerations which induce the refusal to recognize an unsupported confession in divorce cases apply in this suit. The presumption of the husband's coercion in obtaining the confession and the impolicy of accepting an admission of the wife, which may free the husband from the obligations of his marriage contract to support her and cast that duty upon the public, are presented here quite as effectually as in a divorce suit.

The circumstances under which the alleged confession by the wife of her adultery was given are substantially these: The husband had for several years prior to 1898 maintained adulterous relations with a paramour. He had for a long time of his own choice, ceased to observe his marital relations with

his wife. In March, 1898, she had filed a petition for divorce against him, on the ground of his adultery, with a prayer that he might be compelled to provide for her and support her. He had treated her with great harshness and cruelty, but as yet she lived in his house. The husband had not put in any defence to the divorce suit, but claims that the wife did not prosecute it because he had told her " that if she pushed it he would fight it, and that she stopped it, and did not go any further." He says that about May 30th, 1898, which, it is to be noted, is about the time he should have filed answer to her divorce suit, he first discovered something which made him suspect her fidelity. This something was that he missed some money, and, in searching for it, discovered a large lot of letters between the bed and mattress in his wife's room, and in her drawer found the picture of the man, who, he says, was her paramour. These letters were afterwards undisputably shown to have been sent by another man, not the alleged paramour, in envelopes addressed to the wife, but the enclosed letters themselves were all written to, and intended for, another woman, a friend of the wife, who had kept them for her friend. Nothing in them contained was proven to relate to the wife, except two references—" Tell Addie [the wife] that the whiskey she gave me done an old woman some good." Another was, " I hope Addie and ——— [the alleged paramour] had a good time." No one but the husband proved that the last quotation was in any of the letters. The wife denies it. The woman to whom they were written was on the stand, but did not prove it. The wife denies the presence of the alleged paramour's picture with the letters; no one but the husband proves it. The husband says he immediately accused his wife, and that she said there was nothing in those letters concerning him, that she only received them for another woman, and this statement of the wife has been proven to have been the truth.

The husband details another letter incident. He testifies that on another occasion he proposed to open the wife's chiffonier, but that she resisted and seized something from it, which he imagined was a letter. She hid this something in her stocking

and ran out of the house, he pursuing her. She got away, but afterwards, he says, confessed that what she hid was a letter from her paramour, and the husband says he found it, torn in small pieces, alongside a neighboring fence. He put them together, so that he could intelligently read it, and recited it from memory on the stand. As stated by him, it was addressed to "Dear Addie" and signed by the alleged paramour's name. It is unnecessary to repeat its contents. They are aggressively nasty, and the conscious possession of such a letter by any woman would go far to cast doubts upon her virtue. The wife denies that there ever was such a letter. She explains that the incident of hiding something in her stocking, and the flight and pursuit, did happen, but with relation to some money which she was afraid her husband would take from her if he knew she had it.

As to this alleged patched letter, whether there ever was any such paper in the wife's possession depends wholly upon the husband's uncorroborated testimony, which is flatly contradicted by her. Their son, Edgar, testifies that his father once showed him a letter addressed "Dear Addie" and signed with the name of the wife's alleged paramour, and that it contained one phrase which he recalls, which coincides with a similar phrase to that which the husband recites as contained in the full letter. Neither the young man nor the father, nor anyone else, attempted to prove that the patched letter was in fact written by the supposed paramour. The only inculpatory facts shown were that the letter itself indicates lecherous relations between the writer and the addressed person, and that it was alleged by the husband that the wife had it in her possession and threw it away in her flight, and that he recovered it. This partially-corroborating testimony of the son was not given under circumstances which made his statements credible. He admitted on cross-examination that before this cause was actually moved, in December, 1898, by the taking of depositions before Philip S. Scovel, Esq., master, his father had shown this patched letter to him, but he testified that he did not know whether his father knew that he was acquainted with it. This was certainly false,

for if his father showed him the patched letter each must have known that the other knew of it. The reason for this prevarication was that the young man was sworn in his father's behalf, before Master Scovel, and testified about seeing letters supposed to suggest doubts of the wife's fidelity, but he never mentioned this patched letter nor the very incriminating phrase in it which he now repeats. He again testified on this hearing, for the complainant, but made no reference to this patched letter, nor was he cross-examined on it, although his father was in court and heard his testimony, and if the son was shown it by the father, the latter must have known that the son could testify to it. The son never disclosed his knowledge of it in any of the preceding depositions nor until recalled as a witness for his father. Before he first deposed he knew everything he swore to on his last appearance. The situation supports an inference that he never had any knowledge of such a letter, but was finally induced by his father, in the strain of the case, to make the statement in question, which he might safely do, as he narrated incidents outside of the knowledge of anyone but his father and himself.

The son again, for the fourth time, appeared as a witness, and undertook to account for the non-production of the patched letter and the alleged original confessions. He testified that his mother, after she had left his father's house, at first tried to bribe him to deliver the papers to her, and on his refusal came back to the house while his father was absent, and, against the son's protest, took a couple of papers out of his father's private box and carried them away, and afterwards admitted to the son that she had burned them. These papers, he stated, were the patched letter and the original confession. His testimony does not show that he had previously ever seen the alleged original confession, nor did he testify that he actually saw either paper so as to identify it in any way, at the time he says his mother took them out of the box. The testimony of this young man does not command belief. He is about eighteen years of age, and is in his father's employment. His manner of giving testimony was hesitating and uncertain, and left upon the hearer a sense that he was not relating events which he recalled, but was

creating incidents which he was unable, when suddenly questioned, to put in their proper relation to make a consistent story. His testimony is of no weight to corroborate that of his father.

Taking all of the proofs regarding these two events, there is no sufficient evidence to establish their inculpatory character. Some of the circumstances narrated happened, but the testimony given satisfies me that those incidents which tended to cast suspicion upon the wife's character were created by the husband and woven into the narration of other innocent happenings, in order to put her to shame. He had, in fact, no reason to doubt her fidelity, but he was in great straits to have some such accusatory circumstance. Every witness who touched upon these points failed to sustain his testimony, and several contradicted him.

It was after these two incidents as to letters that the confession, alleged to have been made by the wife, came into being. In the latter part of June, 1898, the husband produced to the witness Crane a paper, written by himself, narrating the four acts of adultery on the part of the wife, which are recited in the amendment to the answer. The husband testifies that the wife had stated the facts to him, he had written them down, and she had signed it. He requested Mr. Crane to put it in better form, and the latter, at his home, copied the substance of it and appended an acknowledgment to it, and, at the husband's request, attended at the latter's printing office to have the wife sign it. Mr. Crane prepared the written confession, which was produced in evidence, before he talked with the wife on the subject, copying, in substance, the paper written and handed to him by the husband. In accordance with the latter's request, Mr. Crane, taking both papers with him, attended at the husband's printing office to have the wife sign the confession. The husband went into their residence which was immediately next door to the office, and brought the wife into the office. The witness Crane says, that the wife wanted the husband to be there, but that he (the witness) said, "No, she must be there alone," so the husband went into the adjoining press-room. The witness Crane says, he then read to the wife the copied paper, which is dated July 16th, 1898; told her she did not have to sign it if she did

not want to ; that there was no force about it, and she said she, was ready and willing to sign it, and, did sign it. The husband was then called in, and was told that the wife had signed the paper. He picked it up. She wanted Mr. Crane to keep it, but he declined, and the husband took both the original and the copy and put them in his pocketbook. The witness gives no evidence that the wife made to him any statement about her alleged adulteries, except that she signed and acknowledged the paper which he read, being that one which he had copied from another furnished by her husband. The copied paper written, and witnessed by Crane and signed by the wife, is produced in evidence. The original, written by the husband, is not produced.

The wife denies that she ever made any statement to her husband, denies that she ever signed any written for her by him, and testifies that her signature to the statement prepared by Mr. Crane was obtained from her under these circumstances. Her husband insisted that she should go before some one, naming several, among them Crane, and sign a paper confessing her adultery. She refused, declaring the thing suggested was a false charge. He persisted, repeatedly following her about the house, and threatening and tormenting her to agree to sign such a paper, she always denying and refusing. Finally, Mr. Crane was brought to the office, next door to their residence, by the husband, who told her she had got to go in and sign the paper. He began to swear at her, shook his fist at her, and told her she had got to get out if she did not, and that he would watch and see that she did it. Her nerves had, by his previous worriment, been all unstrung, and, under these threats, she went from her house into the office, the husband waiting in the next room, and signed the paper which Mr. Crane had, at the husband's request, prepared. She says Mr. Crane did not read the paper to her, and that he told her that it didn't amount to a row of pins, and that he believed she was innocent.

The husband testifies that after the execution of this paper there was an agreement between him and his wife that she would stay at his house until he got a housekeeper, and as he expressed it, that "she would do to suit herself and I would do

Perkins v. Perkins.

to suit myself." This language was not further explained, and it may be that it was not intended to indicate that the husband claimed to have agreed with his wife that they might thereafter suit themselves in the commission of adultery. Having in view the undisputed fact that the husband was then carrying on an adulterous relation, and claimed to hold his wife's confession of a like crime, that was the impression his language conveyed to the hearer.

The non-production of the incriminating patched letter and the original confession are thus accounted for by the husband. He says he put them in his private box, and in the fall of 1898 he missed them; he intimates that his wife took them in his absence.

The son testifies as above stated that his mother took these papers out of his father's private box and afterwards told him that they were "in smoke."

It will be noted that the whole question whether there was any original confession turns upon the testimony of the husband. He received the alleged confession, and prepared the written statement which he says his wife signed. She denies that there ever was any such confession by her, and that she signed any other than the one written by Crane by the husband's direction. Mr. Crane, of course, saw the paper which the husband gave him, but he is not shown to have been acquainted with Mrs. Perkins' signature. He says the signature to the original was the same as that Mrs. Perkins made to the new paper in his presence, but no other proof than this supports the claim that she ever signed the first paper. It was quite within the husband's power to have framed the supposed original confession and to have simulated his wife's signature to it.

The wife admits that she did sign before Mr. Crane the written confession which is produced, but declares it was obtained by the threats and compulsion of the husband. The husband's own story is that he obtained the confession from his wife when she and he were alone together. He said it was voluntarily made after he got the letters and about three weeks before she left his house. There seems to have been no reason whatever

Perkins *v.* Perkins.

why the wife should have made such an acknowledgment. The evidence satisfies me that the patched letter story is a falsehood. No one had ever seen the wife and the alleged paramour in each other's presence. She testifies that she had in fact seen him but once in eighteen years, and did not at first know him. When the supposed confession was claimed to have been made to the husband there was not a single inculpatory fact known which might have led her to confess her shame. There is even in the husband's story no pretence that the acknowledgment came about because of the wife's contrition and remorse. He testifies she made it so that "if he wanted to elevate himself again where he ought to be, he could tell people it was not all his fault; that she was as deep as he." In other words, that she abased herself that he might be exalted. After he says he received the confession, he had no sense of resentment or disgust or even decency. He suffered this woman, who he says had voluntarily confessed to him that she had betrayed him, to remain in his house after her confession. The husband was at this time living in acknowledged adultery. There was a pending divorce suit which his wife had instituted against him, asking a decree that he be compelled to support her, and his answer was about due. He had no regard for his wife, but his defence in this suit on the preliminary application for alimony shows that he had a high esteem for his money. It was necessary that he make some efficient counter reply to her suit, as his adultery was so notorious that it could not be denied. She was then still living in his house, and he was so placed that he could readily create a situation which would be a perfect defence. His temperament and hers were such that he could readily dominate her. That he was capable of exerting against her almost the last degree of violence is shown by his own testimony. He states that he "smacked her alongside of her face," and she undisputedly proves that on several occasions he violently put her out of his house. He claims to have had justification for this violence. Into the truth of this claim it is not necessary to inquire. The fact is plain that he was of such a nature that violence to a woman was easy to him, and she of

such a temperament that he felt safe in exerting it upon her. She testifies that he secured her to appear before Crane and to sign the prepared paper by persistent importunity and by threats of violence.

The undisputed circumstances surrounding the making of the supposed confession tend to confirm her story. He had the paper prepared in advance; this saved the necessity for any explanation of the facts by her to Mr. Crane. He invited Mr. Crane to come to his office, and himself went after Mrs. Perkins, whom he saw alone, and brought her into Crane's presence. Crane says she wanted Mr. Perkins to stay in the office, and it was Mr. Crane who sent him away, and not he who voluntarily absented himself. The paper which Mr. Crane had prepared was read to her; she signed it; he took her acknowledgment; there seems to have been no conversation about it, except that he told her she need not sign it if she did not want to do so. Mr. Crane says "there was not much chance for any talk back and forth, because as quickly as the paper was signed we sent for Mr. Perkins to come in, and there was no argument at all about the matter." Mrs. Perkins wanted Mr. Crane to keep the paper, but he declined, and Mr. Perkins took it away. The acknowledgment does not contain the phrase "without any fear, threats or compulsion on the part of her husband." It simply certifies that she acknowledged it to be her voluntary act and deed.

Considering all of the evidence touching the creation of this supposed confession, it appears to have been originally admittedly secured by the husband privately from the wife. Such a confession presented by the oath of the husband alone could never have been the basis for a decree that the wife was an adulteress. *Summerbell* v. *Summerbell, ubi supra,* and cases there cited.

The circumstances of alleged corroboration show the continued action of the husband in procuring the alleged confession to be put in more available form, all the while under his immediate attendance and surveillance save only during the short instant that the wife's signature and acknowledgment could be secured, and during even that time it was known to the wife that he was

in the next room waiting for her to sign it. In my view the clear weight of the testimony goes to show that whatever probative force this alleged confession appears to have is the result of the action of the husband in overcoming the will of his wife, and that it ought to be rejected.

When, however, corroborating proof is sought of the detailed facts of the supposed adulteries of the wife narrated in the confession, there is an absolute absence of any support. No witness testifies that the wife and the paramour were ever seen together. The husband says that on the one occasion on which, after sixteen years' absence, the alleged paramour came to their house, the wife told him that the paramour had kissed her several times, but she denied this statement; no other proof sustains it. One of the acts of adultery stated in the confession named a day when the parties registered, at a named Philadelphia hotel, as man and wife. There was no attempt to prove that the fact happened as narrated in the confession, save that the son testified that, on that date named, his mother was absent from home. Other proof showed that on the time named she was with her sister. Neither any clerk, nor other person in the hotel, nor its registry-book was produced to show that the parties were at the named hotel as stated in the confession. The evidence shows neither proof of any such feeling between the wife and the alleged paramour as might have tempted her to forget her marriage vows, nor of any opportunity to gratify such a feeling had it existed.

The defence of the adultery of the wife has entirely failed, and the evidence necessary to support a decree for alimony under the twentieth section of the Divorce act is sufficient.

Upon consideration of all the circumstances of the case a decree will be advised that the husband pay to the wife, for her maintenance and support, the sum of $7 every week until the further order of the court, with an additional counsel fee of $25 and the costs of this suit.